Filed 8/28/18; pub. order 8/31/18 (see end of opn.); prev. pub. order 8/29/18 vacated

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID PHILLIP RODRIGUEZ,<br><br>    Defendant and Appellant. | F073594<br><br>(Super. Ct. No. 12CM7070)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County. James T. LaPorte, Judge. (Retired judge of the Kings County Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Lauren E. Dodge, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

While an inmate at the Substance Abuse Treatment Facility in Corcoran, appellant David Phillip Rodriguez was involved in a melee with some correctional officers. A jury subsequently found him guilty of battery by an inmate on a non-inmate, attempted battery by an inmate on a non-inmate, attempted interference with an officer's performance of duty, and two counts of assault with a deadly weapon by an inmate. On appeal, Rodriguez argues that (1) the trial court erred when it failed to instruct the jury sua sponte on simple assault as a lesser offense necessarily included in assault with a deadly weapon by an inmate; (2) the trial court erred because its instructions on assault with a deadly weapon by an inmate did not designate the two victims by name, leading to a possibility of convictions on both counts without certain necessary findings being made; (3) the prosecutor committed the form of prejudicial misconduct known as "vouching" by arguing to the jury that the correctional officer witnesses would not lie because lying would destroy their careers and lead to their prosecution for perjury, even though no evidence of such consequences was presented; and (4) the above errors were prejudicial cumulatively even if not separately.

We agree with arguments (1) and (3) and reverse.

## FACTS AND PROCEDURAL HISTORY

The district attorney filed an information against Rodriguez alleging five counts: (1) assault by a state prison inmate with a deadly weapon (a chain) on Brian Stephens (Pen. Code, § 4501);[1] (2) battery by an inmate on Stephens, a non-inmate (§ 4501.5); (3) attempting to deter or prevent Stephens, an executive officer, from performing a duty (§ 69); (4) assault by an inmate with a deadly weapon (a chain) on Larry Dall (§ 4501); and (5) attempted battery by an inmate on Dall, a non-inmate (§§ 664, 4501.5). For purposes of sentence enhancement, the information alleged that Rodriguez had a prior

---

[1] Subsequent statutory references are to the Penal Code unless otherwise noted.

strike under the Three Strikes Law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and three prior felony convictions that resulted in prison terms (§ 667.5, subd. (b)).

Correctional Officer Brian Stephens testified at trial. On October 27, 2011,[2] Stephens was working at the Substance Abuse Treatment Facility (SATF), in the education area in a portion of the facility known as C yard. At around 11:40 a.m., Stephens was approaching the building entrance from the C patio when he saw Rodriguez inside in a hallway, walking toward the patio. Stephens testified that although inmates were permitted to be on the patio, Rodriguez was supposed to be in a classroom at that time, not in the hallway heading for the exit.

Stephens observed that Rodriguez was wearing handcuffs of the type that are part of a waist restraint system. When worn properly, these handcuffs are attached by short chains to a chain at the wearer's waist. The chain around the waist is secured at the wearer's back with two padlocks. This arrangement limits the range of motion of the wearer's arms and hands. Stephens did not know whether the chain was properly secured around Rodriguez's waist, however. Rodriguez's waist was covered by his untucked shirt. Rodriguez's hands were at his sides.

Stephens and Rodriguez met near the building entrance and Stephens asked Rodriguez where he was going. Rodriguez said, "I need to get out of here. I got to get back to the building." Stephens told Rodriguez to wait while he went to ask the teacher if Rodriguez was allowed to leave class. With Rodriguez standing a few feet behind him, Stephens then turned his head to one side, looking for an officer to watch Rodriguez

---

**2**     This appeal was filed years after the crime and conviction. On February 16, 2016, this court granted Rodriguez's petition for writ of habeas corpus, in which he sought leave to file a late appeal on the ground that he asked his trial counsel at the time of sentencing to file a notice of appeal, but counsel never did so. We invited the People to file an informal response to the petition, giving them notice that their failure to file one would be deemed a concession that Rodriguez should be allowed to file his appeal. No informal response was filed.

while he checked with the teacher. Next Stephens saw something shiny from the corner of his eye and felt a "[v]ery heavy and hard" blow on the back part of the top of his head. As far as he knew, there was just the one blow.

Stephens saw stars and his knees buckled. He remained conscious, however, giving orders to other inmates as order was being restored.

Stephens testified that he sustained a concussion and injuries to his neck and shoulder. He was taken away in an ambulance. The jury was shown a photograph that Stephens identified as a representation of the back of his head, where he was hit. Stephens circled the area where contact was made. He conceded, however, that no injury was visible in the picture. He said the injury was concealed by his hair. In the picture, a copy of which is in the appellate record, there appears, within the circle Stephens drew, what could be a reddish area of scalp visible between strands of hair. No medical evidence was presented.

Correctional Officer Roger Lowder testified that he also was working at the SATF on the day in question. On October 27, 2011, at around 11:40 a.m., he was in the medical clinic on C yard. As he walked out the door of the clinic onto the C patio, he heard someone yell "get down" and saw Rodriguez standing behind Stephens in the education area doorway, about 20 yards away. Rodriguez was hitting Stephens with his fists. The handcuffs were on Rodriguez's wrists, but the chain was not around his waist. Instead, the chain was wrapped around his hands, his hands formed fists, and the padlocks and four to six inches of chain were hanging from his left fist. Lowder saw Rodriguez twice raise his hands with the chains on them, and bring them down together onto Stephens's head, neck, and shoulders. He testified that he was 100 percent certain he saw Rodriguez hit Stephens twice in this manner.

Lowder and a number of other officers ran toward the altercation. Lowder saw Rodriguez turn toward Officer Sullins and then hesitate. Officer Dall drew his baton. Rodriguez turned toward Dall. Sullins drew her pepper spray canister. Rodriguez held

4.

his arms out toward Dall, and the chain swung within about two feet of Dall's face, but Dall was not hit. Then Sullins and Dall subdued Rodriguez with the pepper spray and baton. (Officers Sullins and Dall did not testify.)

Lowder authenticated a video recording of the events at issue, taken by a camera positioned on the C patio and aimed at the doorway where the altercation began. The video was played for the jury.

The video recording the jury saw, which is included in the appellate record, is 44 seconds long. The resolution is poor. Individuals' features cannot be made out and clothing is blurry. During the first 25 seconds, two figures in greenish clothing are seen walking on the C patio, stopping at a spot in the wall with two doorways. During this same period, a third green-clad figure emerges from one of the doorways and then stands just outside the other. At the 26th second, a figure in blue clothing emerges running from that doorway. It is impossible to discern whether or not he is wearing handcuffs or chains. He appears to collide with the green-clad figure standing just outside the doorway, who stumbles, runs a few steps away and then turns back. One of the other green-clad figures makes way for the running figure at first, and then turns and faces him. All three green-clad figures surround the blue-clad one. The blue-clad figure runs toward one and then another of the green-clad figures, extending his arms in front of him once or twice, and is knocked to the ground as he does so. At the 31-second mark, the blue-clad figure is lying prone on the pavement and being restrained by two of the green-clad figures, as many more green-clad figures enter the frame and converge on them.

Lowder testified that as the scene in the video begins, he is also on C patio, but outside the frame. He identified the first two figures who appear in the video as Sullins and Dall, and the third as Stephens. Rodriguez is the blue-clad figure who runs out the door. Lowder heard "get down," looked, and saw Rodriguez strike Stephens twice in the doorway. He conceded that, in the video, it is not possible to see Rodriguez striking Stephens, but he reaffirmed that he witnessed this as it was happening, from a distance of

5.

60 feet.  The figures toward whom Rodriguez moves next are Sullins and Dall.  Lowder is one of the many officers who converge on the scene at the end.  Correctional Officer Kevin Curtiss is another.

Officer Curtiss testified that he arrived on the scene after Rodriguez was already on the ground.  The part of the waist restraint system that goes around the waist was off Rodriguez's body and was under him as he lay prone.

Rodriguez testified in his own defense.  He said that on the day of the incident, he was in his cell, which he had not left for three or four weeks.  Correctional officers came to his cell and said he had to go to education.  They did not say why.  Rodriguez told them he did not want to go.  As the parties stipulated at trial, Rodriguez's father, grandmother, and uncle had all died within a short span of time, about two weeks earlier.  He wanted to stay in his cell.

The officers said Rodriguez had no choice, however; he would have to go and could tell the teacher he did not want to stay.  When he arrived, he told the teacher he had had deaths in his family and wanted to go back to his cell.  The teacher said Rodriguez had to stay and take a GED test.  Rodriguez had not signed up for the test and wanted to go back, so after some discussion, he got the teacher's permission to use the restroom.  In the restroom, he washed his face.  At this point he was wearing a waist restraint system, but the chains were long enough for him to reach his face with his hands.  The system was secured around his waist.

Instead of going back to class, Rodriguez headed for the door to go back out onto the patio.  At the exit, he encountered Officers Stephens and Sullins.  He was asked where he was going, and answered that he needed to go back to his building.  Rodriguez was crying now, and not wanting to be seen that way was another reason why he wanted to go back to his cell.  Stephens asked Rodriguez what was wrong with him.

6.

At that point, Rodriguez and Stephens "got into a light argument," Rodriguez testified. "He got an attitude with me and I got an attitude with him and I just wanted to go back. I wasn't trying to hear what he was having to say."

Rodriguez testified that he then walked on, passing Stephens. "He tried to get out of my way, stumbled back and I just kept going forward," he said. Rodriguez heard an alarm, someone saying "get down," and some shots. He tried to run back to the classroom, but he "got pepper sprayed and went to the ground." Rodriguez never struck Stephens with anything and did not make contact with anyone else, according to his testimony. He said the waist chains were around his waist and it would be impossible to hit anyone with them.

The jury found Rodriguez guilty on all counts. The parties agreed to a disposition on the prior conviction allegations: Rodriguez admitted the strike prior and the prosecution moved to dismiss all the prison priors.

The court sentenced Rodriguez to an aggregate prison term of 14 years eight months, calculated as follows: on count 1, the upper term of six years, doubled for the prior strike, plus a consecutive two years eight months (one-third of the middle term) on count 4. The sentences on counts 2, 3, and 5 were stayed pursuant to section 654.

## DISCUSSION

### I.    *Jury instructions*

Rodriguez argues that the jury instructions on the assault with a deadly weapon counts were erroneous in two respects: (1) they failed to include instructions on the lesser included offense of simple assault, and (2) they failed to include the names of the victims.

In a criminal trial, the court must give an instruction requested by a party if the instruction correctly states the law and relates to a material question upon which there is evidence substantial enough to merit consideration by the jury. (*People v. Avena* (1996) 13 Cal.4th 394, 424; *People v. Wickersham* (1982) 32 Cal.3d 307, 324, overruled on

7.

other grounds by *People v. Barton* (1995) 12 Cal.4th 186, 201.) With or without a request, the court is required to give correct jury instructions on the general principles of law relevant to issues raised by the evidence. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530.) Further, an appellate court can address an incorrect instruction to which no objection was made at trial if the instruction impaired the defendant's substantial rights. (§ 1259.)

A trial court must give an instruction sua sponte on an uncharged lesser offense that is necessarily included in a greater charged offense if the evidence warrants the instruction. (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).) The evidence warrants the instruction if there is substantial evidence on the basis of which a reasonable factfinder could find the defendant committed the lesser offense and did not commit the greater. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) We review de novo the court's instructions on lesser included offenses. (*Cook, supra*, 39 Cal.4th at p. 596.)

The jury in this case was instructed in accordance with CALCRIM No. 2721, as follows:

> "The defendant is charged in Counts 1 and 4 with assault with a deadly weapon while serving a state prison sentence, in violation of Penal Code Section 4501.
>
> "To prove that the defendant is guilty of this crime the People must prove that, one, the defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person. Two, the defendant did that act willfully. Three, when the defendant acted he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone. [Four, w]hen the defendant acted he had the present ability to apply force with the deadly [weapon to] a person. And, five, when he acted, the defendant was confined to a California State Prison.

8.

"Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else or gain any advantage.

"[The t]erms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person is enough. The touching does not have to cause pain or injury of any kind. Touching can be done indirectly by causing an object to touch the other person.

"The People are not required to prove the defendant actually touched someone. No one needs to actually have been injured by the defendant's act, but if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault and, if so, what kind of assault it was.

"A deadly weapon is any object, instrument or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"A person is confined in a state prison if he is confined at the Substance Abuse Treatment Facility and State Prison, at Corcoran."

Rodriguez argues that the court should also have given an instruction on simple assault (§ 240) as a lesser offense necessarily included in assault with a deadly weapon by a prison inmate. The pattern instruction for simple assault, CALCRIM No. 915, is similar to the instruction that was given, except that the references to a deadly weapon and being confined to a state prison, and related definitions, are omitted.

A lesser offense is necessarily included in a greater offense if it is impossible to commit the greater without also committing the lesser. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 747.) It has been held—and the People here do not dispute—that simple assault is necessarily included in assault with a deadly weapon by a prison inmate. (*Id.* at pp. 747-748.) One who commits assault with a deadly weapon by a prison inmate commits a simple assault, plus he or she uses a deadly weapon and is a prison inmate.

9.

We agree with Rodriguez's view that the lesser included offense instruction was required here. The jury could reasonably find, based on the evidence, that Rodriguez assaulted Stephens and Dall, but did not use the chains or anything else as a deadly weapon. Some items, such as dirks and blackjacks, are deadly weapons as a matter of law; but most objects are not inherently deadly and can be found to be deadly weapons only if used in a manner and under circumstances likely to produce death or great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029.) The evidence would have supported a finding that Rodriguez assaulted Stephens and Dall, but that there was a reasonable doubt regarding whether he used the chains as a deadly weapon, or used them at all, in doing so. The jurors could reasonably have believed Rodriguez was exaggerating the innocence of his intentions when he indicated he merely collided with Stephens by accident, while at the same time finding he was not employing the chains as a weapon. They could reasonably have believed Rodriguez's testimony that the chains were always secured around his waist during the incident. The video would be consistent with these findings, as would the absence of medical evidence and Stephens's concession that the photograph of his head showed no injury. Jurors could reasonably find that Rodriguez was just using his hands with the cuffs on his wrists, and that even if Rodriguez caused the chains to make contact with Stephens (and caused them to swing toward Dall), there was a reasonable doubt he used them in a manner likely to produce great bodily injury.

The error was not harmless. Failure to give a required instruction warrants reversal when there is a reasonable probability that the defendant would have obtained a more favorable outcome if it had been given. (*Breverman, supra,* 19 Cal.4th at p. 178.) Under the instructions given, the jury was forced to choose between assault with a deadly weapon and no assault at all. In light of the video and the other evidence, it is fair to say no assault at all is the less likely of the two, even though both are reconcilable with the evidence. There is a reasonable probability that the jury chose assault with a deadly

10.

weapon just to avoid the more implausible alternative, and would have found simple assault if that had been an option.[3]

The People contend that the evidence was insufficient to support a finding of simple assault because Rodriguez in his testimony and defense counsel in his closing argument both maintained that there was no assault at all; consequently, the jury's choice was between believing the prosecution witnesses and finding assault with a deadly weapon and believing Rodriguez and acquitting him on these counts. It is not true, however, that the jury was limited to choosing between the competing theories of the case proposed by the attorneys, or between the conflicting accounts given by the two sides' witnesses. It is well established that the jury is entitled to form its own theory of the case, if supported by the evidence, and to pick and choose the parts of each witness's testimony that it finds credible, provided there is substantial evidence in support of the view it decides to take. (*Breverman, supra*, 19 Cal.4th at pp. 157, 159-160, 162-163; *People v. Chestra* (2017) 9 Cal.App.5th 1116, 1121.) As we have said, the jury in this case could reasonably do all of the following: (1) believe the prosecution witnesses' testimony that Rodriguez attacked them; (2) reject the prosecution witnesses' testimony that Rodriguez wrapped the chains around his fists and used them to deliver, and try to deliver, forceful punches; (3) believe Rodriguez's testimony that the chains were secured around his waist and he never used them as a weapon; (4) reject Rodriguez's testimony that he never meant to make contact with anyone. In short, a finding that all the

---

[3]     The difference between simple assault and assault with a deadly weapon by a prisoner was a matter of grave significance to Rodriguez. For a second striker, the maximum prison sentence for assault with a deadly weapon by a prisoner is the sentence Rodriguez received: Twelve years. Simple assault is a misdemeanor with a maximum jail term of six months. (§ 240.) Simple assault on a peace officer is also a misdemeanor, with a maximum jail term of one year. (§ 241.) The impact on punishment is, of course, not a factor in the analysis of whether a lesser included offense instruction was required, but it would have been an important consideration had it been necessary to analyze the effectiveness of trial counsel.

11.

eyewitnesses were exaggerating or minimizing the facts would have been consistent with the evidence. There are, of course, cases in which a lesser included offense instruction is not required because there is nothing in the defense case (or otherwise) that would have supported a guilty verdict on the lesser offense but not the greater. But this is not such a case.

For all the above reasons, we hold that the trial court's omission of lesser included offense instructions on counts 1 and 4 was reversible error as to those counts.

Rodriguez's second argument about the assault instructions is based on the fact that, as indicated above, the instructions referred to the application of force to "a person" instead of naming Stephens and Dall, as was done in the information. Rodriguez's view is that by giving the same nonspecific instruction for both counts, the court improperly enabled the jury to convict on both counts even if he never had a present ability to apply force to more than one person. The People argue that Rodriguez forfeited the issue by failing to object in the trial court and that in any event the instructions were not erroneous. The People further argue that any error was harmless because the verdict forms named Stephens and Dall separately for each count. Because we have concluded that the assault instructions were reversibly erroneous since they failed to include the lesser included offense, we need not address this additional issue.

## II. *Prosecutorial misconduct*

During the rebuttal portion of his closing argument, the prosecutor pointed out that Rodriguez's testimony conflicted with that of the officers, and the jurors would have to decide whom to believe. Developing this theme, the prosecutor offered some reasons why the officers were credible witnesses:

> "The jury instructions provided by the Judge list a number of factors for you to consider when you are evaluating the credibility of witnesses. I want to highlight one of those factors for you and that is motive to lie. Who in this trial, when they testified before you, had a motive to lie, the officers or the defendant?

"Let's start with Officer Stephens. [¶] … [¶] What did Officer Stephens tell you? He told you that he was attacked. He was hit from behind. Now, I ask you what motive would he have to lie? Sort of anticipating a defense like this, when Officer Stephens was on the stand I asked him, before that day, to your knowledge, had you ever seen the defendant before? No. Did you know the defendant? No. So you are being asked to believe by the defense that Officer Stephens, an officer, I think, with 17 years of experience with the Department of Corrections, for some reason, would put his entire career on the line. He would take the stand, subject himself to possible prosecution for perjury and lie and make up some story and tell you that this guy, who he didn't know, attacked him and hit him on the back of the head. For what reason? What possible motive would he have to do that?

"But you add to that the testimony of Officer Lowder. Officer Lowder testified this guy, the defendant, hit Officer Stephens. So, now, we have two officers involved in this lie, apparently, according to the defendant. Another officer with a long career. His was over 20 years. So we're supposed to believe that, for some reason, Officer Lowder would put his entire career with the Department of Corrections at risk, subject himself to possible prosecution for perjury—"

At this point, defense counsel interposed an objection: "Assumes facts not in evidence." The court did not state expressly that it was overruling this objection; instead, it simply directed the prosecutor to go on with his argument: "Excuse me. Go ahead. You may continue." The prosecutor went on:

"To perjure himself before you and, for some reason, lie and tell you that this defendant hit Officer Stephens on the back of the head. I submit to you what reason would he have to do that? There's no motive to lie that we know of."

Rodriguez maintains that this argument in support of the officer witnesses' credibility constituted prosecutorial error or misconduct because it amounted to the prosecutor vouching for the officers' honesty based on facts that were not before the jury, i.e., the facts regarding the likelihood of being fired or prosecuted that would deter the officers from lying.

At the threshold, the People argue that Rodriguez forfeited this issue by not asking for a curative admonition. "'"As a general rule a defendant may not complain on appeal

13.

of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 284.) The People point out that although defense counsel objected, he did not ask for a curative admonition.

We think that, under the circumstances, counsel's objection alone sufficed to preserve the issue for appeal. Despite the general rule just stated, "the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.'" (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) The trial court in this case did not say the word "overruled," but its action—immediately directing the prosecutor to resume making the objected-to argument—cannot reasonably be interpreted as anything other than a decision to overrule defense counsel's objection. The People speculate that the judge might not have heard the objection, so defense counsel was obligated to repeat it and demand an express ruling. But we think the court's intention was sufficiently clear. Asking for a curative admission would have been futile. Further, even if trial counsel had forfeited the issue, we would have exercised our discretion to address it anyway, for we believe the matter is important, both in general and in this case. "[A]n appellate court may review a forfeited claim—and '[w]hether or not it should do so is entrusted to its discretion.'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.) We turn now to the merits.

"Under the federal Constitution, to be reversible, a prosecutor's improper comments must "'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process."' [Citations.] "'[On the other hand] conduct by a prosecutor that does not render a criminal trial fundamentally unfair is [still] prosecutorial misconduct under state law … if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'""" (*People v. Cunningham* (2001) 25

14.

Cal.4th 926, 1000.) "When, as in the present case, the claim is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*Id.* at p. 1001.) Despite the usual formulation of the state-law standard in terms of deceptive or reprehensible methods, the prosecutor's behavior need not be in bad faith in order to constitute reversible error; the impact on the defendant can be just as prejudicial if the conduct is inadvertent. (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214 (*Bolton*).) For this reason it has been said that "prosecutorial error" would be a better name for the doctrine. (*Hill, supra*, 17 Cal.4th at p. 823, fn. 3.)

The misconduct or error claimed by Rodriguez is classified as "vouching" for a witness, which is an instance of a broader classification of improper prosecutorial arguments relying on evidence not admitted at trial. "Closing argument presents a legitimate opportunity to 'argue all reasonable inferences from evidence in the record.' [Citation.] However, this court has for a number of years repeatedly warned 'that statements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct.'" (*Bolton, supra,* 23 Cal.3d at p. 212.) Our Supreme Court has further stated:

> "We have explained that [a prosecutor's reference in closing argument to facts not in evidence] is 'clearly ... misconduct' [citation], because such statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." [Citations.]' [Citations.] 'Statements of supposed facts not in evidence ... are a highly prejudicial form of misconduct, and a frequent basis for reversal.'" (*Hill, supra*, 17 Cal.4th at pp. 827-828.)

"Vouching"—the specific form of reliance on facts outside the record at issue here—occurs when a prosecutor offers an opinion on the credibility of a witness based on his or her own "experience or on other facts outside the record." (*People v. Huggins*

15.

(2006) 38 Cal.4th 175, 206-207; see also, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 200; *People v. Williams* (1997) 16 Cal.4th 153, 257.) The danger arising from vouching is that the improper "prosecutorial comments may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence." (*Cook, supra,* 39 Cal.4th at p. 593.)

The doctrine of prosecutorial error by vouching has been applied in California to a situation much like the one here. In *People v. Woods* (2006) 146 Cal.App.4th 106 (*Woods*), there were multiple instances of improper prosecutorial argument, one of which closely resembled the portion of the prosecutor's closing argument at issue here. Regarding police officers involved in a sting operation against the defendant, some of whom testified, the prosecutor made arguments as follows:

> "'In a day of videotapes and people standing out with video cameras, do you honestly believe that out of 12 officers that went to that location that day they all sat down and got together and cooked up what they are going to say, that they all agreed as to what was going to go into the report, and they allowed that report to be filed with their names in it and their serial numbers in it? They are going to risk their careers and their livelihood for kilos of cocaine? For some heroin? Maybe for some stolen Maserati car parts? No. For five rocks of cocaine? That's what this comes down to, ladies and gentlemen. Mr. Woods and his cocaine that he tossed that day. 12 officers, 12 individual careers, pensions, house notes, car notes.' Defense counsel objected that there was no evidence to support the argument. The court overruled the objection.
>
> "[The prosecutor] continued her argument, stating 'Bank accounts, children's tuition.' Defense counsel asserted a 'running objection,' which the court overruled.
>
> "After the ruling on the objection, [the prosecutor] resumed the argument, saying, 'Are these 12 officers willing to risk those things for Mr. Woods and his five rocks of cocaine?' Defense counsel objected that '12 officers didn't testify.' By directing [the prosecutor] to continue, the court implicitly overruled the objection." (*Woods, supra*, 146 Cal.App.4th at p. 114.)

The Court of Appeal held:

"[The prosecutor's] argument strayed … into impermissible territory when she implicitly suggested that all 12 unidentified, mostly nontestifying officers … had been involved in a case or cases involving higher stakes such as kilos of cocaine, heroin, and stolen Maserati parts, but had not risked their careers for the higher stakes case or cases; and the same 12 officers had mortgages, car loans, and children in private schools. Although the officers' financial obligations and experience were irrelevant to appellant's guilt, [the prosecutor] argued these factual matters outside of the record to attempt to establish the veracity of the few members of the group of 12 officers who testified.  This constituted vouching." (*Woods, supra,* 146 Cal.App.4th at p. 115.)

The published California case law on this particular form of vouching (asserting without evidence that law enforcement witnesses would not lie because of the professional, financial or legal harm they would suffer) is scant; besides *Woods*, we have found only one other case (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, about which we will have more to say below), although we suspect this prosecutorial tactic is not uncommon.  As indicated in Rodriguez's brief, there are also some federal appellate cases in which the same fact pattern was found to constitute improper vouching.  (*United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1146 [among statements constituting improper vouching was assertion that police officer witnesses would not lie because they would risk prosecution and loss of jobs and pensions; existence of such risks was outside record]; *United States v. Combs* (9th Cir. 2004) 379 F.3d 564, 574-576 [prosecutor's argument that agent would not lie because it was "darn sure" he would be fired for perjury was improper vouching]; *United States v. Gallardo-Trapero* (5th Cir. 1999) 185 F.3d 307, 319-321 [prosecutor committed improper (but harmless) vouching with argument that federal agents and federal prosecutor would not commit perjury, as this would endanger their careers].)

Though none of this is controlling authority, we agree with the approach taken in *Woods* and the federal cases cited above; and we hold that under this approach, this case presents an example of improper vouching.  The prosecutor's argument that the officer witnesses would not lie because of the danger to their careers and the risk of prosecution

17.

for perjury relied on facts not in evidence. The impact of the prosecutor's remarks depended on the truth of a number of propositions, none of which come close to being self-evident: that law enforcement officers of long tenure are more likely to be honest than other people; that they can firmly expect to lose their jobs if they lie or exaggerate when testifying against those accused of crime; or that they face a grave risk of prosecution for perjury by the very prosecutors who have presented their testimony if they do this; that these factors are so powerful in the minds of officers that they would feel no motivation to lie in order to maximize the punishment of those who attack them. There was, of course, no evidence at trial that was relevant to any of these notions.

A prosecutor arguing in this way takes advantage not of the evidence before the jury but of the good-natured inclination of lay jurors to vest their confidence in those entrusted with the enforcement of the law. This confidence is valuable and admirable, but if exploited it places those accused of crime at an unfair disadvantage.

The reader who is inclined to view such prosecutorial argument as innocuous puffery at worst might consider a hypothetical type of defense argument that, without supporting evidence, would exploit a contrary tendency on the part of the lay public: the tendency to view those who exercise authority with suspicion, and to fear their possible corruption.[4]

---

[4]    In this case, such an argument might have gone like this:

"The jury instructions say you may consider witnesses' possible motivations for lying. The prosecutor says you should believe his witnesses because they have no motive to lie, while my client is untruthful. But if you consider the facts, you'll see it's just the opposite. On the day in question, Mr. Rodriguez was a prisoner and an addict. He had nothing to gain by a deliberate attack on those guarding him, and a great deal to lose: more time in prison; the loss of his place at the SATF; perhaps a beating by the guards. And, of course, he would have no chance of getting away with these alleged crimes. Inside a prison he could not flee, could not claim an alibi or mistaken identity. The only possible outcome was finding himself at the bottom of a pile of guards, on video. Deliberately attacking these guards would quite simply be

insane. My client is telling the truth because he had no motive to commit the crimes and powerful motives not to do so.

"Now consider the motives the guards have for lying. Here's a prisoner who talked back, acted out, caused a big disruption. The guards can't have that. They have to make an example. They have to put the prisoner in his place, show him who's boss. If they beat him, well, there are cameras and there might be consequences. How to punish the prisoner and get away with it? Nothing easier. Check the video, see what you can plausibly claim consistent with it. Then go to the D.A. Exaggerate what happened within the limits of that plausibility. Was my client just having a freakout over the deaths of his family members? Say it was a deliberate attack instead. Did one officer bump his head? Say Mr. Rodriguez viciously slammed him on the head with chains—once, twice, whatever (though it's better when the officers get their stories straight). Make sure you describe an aggravated assault, because that's a serious felony, not just an assault, which is a misdemeanor. Lock him up for a long, long time beyond the sentence he's already serving. That'll send a powerful message to any other prisoner who might think about crossing us.

"But the prosecutor says nothing like this could ever happen, because the officers would fear for their jobs and pensions and would risk prosecution for perjury. Nonsense. Maybe in fantasyland—not in the real world. How many times have you read in the newspaper that an officer was fired and jailed for perjury? Yet studies have shown that working in law enforcement involves quite a bit of lying, more than in civilian life. Officers know they can get away with it, because they have that code of silence, the omerta you have heard about; because prosecutors will not go against them; because the system is their system.

"So now think again about that question the prosecutor asked you: who's more likely to be lying?"

This hypothetical argument is filled with improper statements, and they are all improper in the same way the prosecutor's argument was improper in this case: They assume, and depend for their persuasive power on, alleged facts of which no evidence was presented to the jury, and of which no evidence probably could be presented. No trial judge would allow defense counsel to argue in such a way, and properly so. Yet it seems prosecutors continue to argue that officers would never lie for reasons of which the jury never hears any evidence, and trial courts continue to permit it. For the reasons we have stated, the practice should be stopped, and trial courts are obliged to sustain appropriate objections to it.

19.

The People argue that in this instance, the prosecutor's reliance on facts not in evidence was proper and did not constitute vouching because it was on rebuttal, in response to defense counsel's arguments about who was telling the truth. They point to portions of defense counsel's closing argument included in the following passages:

"Mr. Lowder says there's multiple times that he sees him slam his hands down on Officer Stephens' head, neck and shoulders. Of course, Officer Stephens said even if he was struck, it was only once and he sees it out of his peripheral vision.

"Look at the video. That's not what happens. This defendant is rushing [past] Officer Stephens. There is no downward motion, as Mr. Lowder described. And, in fact, I submit to you Officer Lowder, though he may be a nice guy, could not have seen what he says he saw. Look at the distance that he was at, some 60 feet away, and his confusion as to whether I was facing that direction. The problem is he says the first thing that attracted him was someone yelling the word get down. Well, Officer Stephens never yelled that. There's no testimony as to who yelled that or when. And there would have been no reason to get down if there was a discussion going on. So, in fact, Officer Lowder would have only been attracted to this situation after the fact."

"I ask you to just look carefully at the evidence here, Officer Stephens' story, that's not supported by the photographic evidence, that's not supported by Mr. Lowder's statement. Mr. Lowder's statement, that's not supported by the physical evidence, by the photographs, by the video that we see. Officer Lowder is behind two other people at the point that this issue with Officer Dall is supposedly happening. He's some 60 feet away. 20 yards. Could he have seen all of this detail that he described? I submit to you that he did not.

"I ask you to look closely. And, in reality, these still photos just kind of set the scene. But the video that you watched, the video that I showed and, in reality, stopped many times frame by frame for the officer to look at—because I can tell you I wasn't afraid of showing the video. I wasn't afraid of showing you frame by frame what was happening because frame by frame shows you exactly what did happen. An emotionally distraught inmate is confronted at the door by an officer with an attitude and he goes to get [past] him. If there's contact, it's incidental. And as he's trying to move [past] him, another officer confronts him. And you watch—watch that video and watch that time. And we're talking about less

than a second that when he steps [past] Officer Stephens there's another officer there and he goes to the ground. Is that a calculated, willing, on purpose assault on these officers? I submit to you that it's not. Is that a calculated, purposeful, willing and on purpose action of battering Officer Stephens and attempting to batter Officer Dall? I submit to you that it's not. Because, you know, one thing, if Officer Lowder really saw all of this that's kind of, I guess, helpful to me I guess I can talk about, but I'm not sure he ever really saw it."

"Is there, in reality, real action to prove up all of these charges the People have placed in this situation? I submit there is not. The fact there are so many who are lessening and lessening and lessening each time shows that, in reality, we're grasping."

None of these remarks were inappropriate. There is no error or misconduct in defense counsel urging the jury to draw conclusions favorable to the defendant based on an analysis of the evidence. Counsel's remarks here were nearly textbook examples of partisan yet fair analysis of the evidence. (One or two sentences might have been unintelligible, but they were not unfair.) The People do not even argue that there was anything wrong with them.[5] The statements of the prosecutor here at issue, by contrast, were not based on any of the evidence presented to the jury. Instead, they suggested the prosecutor knew things about disciplinary and legal risks faced by officers—things unknown to the jury, for which the jurors should take the prosecutor's official word—that acted to ensure officers' honesty. The People point out that the prosecutor did, in fact, *also* make arguments based on the evidence, but that of course is beside the point.

Proper arguments by the defense cannot excuse or justify an improper rebuttal argument by the prosecutor. It is not at all clear that the prosecution would be entitled to vouch even if it *were* rebutting an improper argument by the defense. (See *United States*

---

**5** The People do argue that some of defense counsel's remarks—those regarding how something was "kind of, I guess, helpful" and about "lessening and lessening and lessening"—were references to "the fact that the correctional officers were coordinating their stories or adjusting their testimony." We do not see how. It is curious, however, that the People would refer to such coordinating and adjusting as a "fact."

*v. Young* (1985) 470 U.S. 1, 11, 18 ["Clearly two improper arguments—two apparent wrongs—do not make for a right result," but the particular improper remarks by both prosecutor and defense counsel in the case tended to offset each other so that jury remained unbiased.].) The notion that *fair* argument by the defense could be grounds for allowing unfair rebuttal argument by the prosecutor is absurd.

The People's brief does not cite *Caldwell, supra*, 212 Cal.App.4th 1262, but that case contains a holding that is very similar to the People's argument here. Defense counsel argued that detectives testified falsely about whether they used correct procedures in conducting a photo lineup. On rebuttal, the prosecutor contended that the detectives would not risk their careers by committing perjury. While conceding that the prosecutor's remarks were similar to those in other cases where vouching was found to have occurred, the Court of Appeal nevertheless concluded that the prosecutor "was not vouching for [the police witnesses'] credibility; he was rebutting the defense attorney's charge that the officers had lied about the photo lineup." (*Id.* at p. 1271.)

We cannot concur in this analysis. An argument constitutes vouching if it bolsters a witness's credibility by relying on matter outside the record, matter the jury might improperly accept based solely on the prestige and authority of the prosecutor's office. That the challenged argument was in response to the other side's argument about the witness's truthfulness—an argument not demonstrated to be erroneous in any way—is not the test. Defense counsel does not open the door for prosecutorial vouching every time he or she argues that a prosecution witness's testimony is untrue.

We turn to the question of prejudice. The prosecutor's remarks were likely to be taken and employed in an improper way by the jury—to give the officer witnesses a boost in credibility not based on the evidence—and there is a reasonable probability Rodriguez would have obtained a better outcome without this error.

The case was essentially about whom the jury believed: Rodriguez or the officers who testified. Other than witnesses' testimony, there was little to support either side's

22.

account of what happened.  The video is consistent with both versions—a deliberate attack versus distraught running and flailing.  There was no medical evidence to corroborate Stephens's testimony about his injuries, and the photograph of the back of his head showed little.  Officer Lowder testified that he saw the waist part of the restraint system wrapped around Rodriguez's hands from a position 20 yards away, but Stephens mentioned no such thing even though he was inches away and saw Rodriguez's hands at his sides; Rodriguez, for his part, testified that the chains were around his waist.  In a swearing contest like this, an unwarranted boost to the prosecution witnesses' credibility could very well alter the outcome.

These considerations support the view that the prosecutorial error was prejudicial with respect to the charges of assault with a deadly weapon, battery on a non-inmate, and attempted battery on a non-inmate.  According to the jury instructions, the assault charges required proof that Rodriguez knowingly and on purpose did an act a reasonable person would understand was likely to result in harmful or offensive contact with the officers.  The battery charge required proof that he touched Stephens in a harmful or offensive manner on purpose.  The attempted battery charge required proof that Rodriguez had a specific intent to do the same to Dall.  His defense was, in essence, that he did not do any of these things knowingly, on purpose or intentionally; instead, he was just trying to run away from the officers to get back to his cell while in an emotionally distraught condition.  The jury's choice between that account and the officers' description of a deliberate attack was, in all probability, highly sensitive to the jurors' assessment of each witness's credibility.

It may appear less clear that Rodriguez was prejudiced with respect to the charge of attempted interference with an officer's performance of duty—it certainly does not appear, in the video, that he was being cooperative—but an examination of the elements of that offense shows that he was prejudiced.  The jury instruction on this count included the following:

23.

"The defendant is charged in Count 3 with trying to prevent or deter an executive officer from performing that officer's duty, in violation of Penal Code Section 69.  To prove that the defendant is guilty of this crime the People must prove that, one, the defendant willfully and unlawfully used violence to try and prevent or deter an executive officer from performing the officer's lawful duty.  And, two, when the defendant acted he intended to prevent or deter the executive officer from performing the officer's lawful duty."

As with the other counts, it is reasonably probable that the improper bolstering of the prosecution witnesses' credibility tipped the balance between a finding of deliberately aggressive behavior, which could satisfy these elements, and a finding of a mere distraught attempt to run away, which might not.

For all the above reasons, we conclude that the improper vouching by the prosecutor during his closing argument was reversible error with respect to all counts.

It is unnecessary to consider Rodriguez's claim of cumulative error.

## DISPOSITION

The judgment is reversed.

_____
              SMITH, Acting P.J.

WE CONCUR:


_____
MEEHAN, J.


_____
ELLISON, J. [†]

---

[†] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/31/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>               v.<br><br>DAVID PHILLIP RODRIGUEZ,<br><br>        Defendant and Appellant. | F073594<br><br>(Super. Ct. No. 12CM7070)<br><br><br>**ORDER DIRECTING<br>PUBLICATION<br>AND VACATING PRIOR<br>ORDER** |

**THE COURT:**

The "order granting publication" filed in the above case on August 29, 2018, was signed by Justice Ellison in error and is hereby vacated. The present order replaces it.

It appearing that the nonpublished opinion filed in the above entitled matter on August 28, 2018, meets the standards for publication specified in California Rules of Court, rule 8.1105, on the court's own motion, it is ordered that the opinion be certified for publication in the Official Reports.

_____
Smith, Acting P.J.

I CONCUR:


_____
Meehan, J.

25.